UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____     )          Civil Action No.
JOHN R. CORCORAN,                     )
          Plaintiff                   )
                                      )
     v.                               )
                                      )
                                      )
CITY OF BOSTON;                       )
SGT. BUCKLEY; and                     )
OFFICER JIMMY GIRALDO,                )
                                      )
          Defendants.                 )
                                      )
_____     )

## COMPLAINT AND JURY DEMAND

This is a "section 1983" civil rights action sounding primarily in false arrest and malicious prosecution.

## PARTIES

1.    The Plaintiff, John Corcoran, is an individual who lives at 17 Durham Street, City of Boston, County of Suffolk, Massachusetts.

2.    The Defendant, City of Boston, is a body politic that can sue and be sued.

3.    The Defendant, Officer Jimmy Giraldo, is an individual whose current domicile is presently unknown but whose place of business is the Boston Police Department.

4.    The Defendant, Sgt. Buckley, is an individual whose first name and current domicile are presently unknown but whose place of business is the Boston Police Department.

## JURISDICTION AND VENUE

5.    The complaint alleges violations of 42 U.S.C. § 1983.  Thus, there is "federal

question jurisdiction" pursuant to 28 U.S.C. § 1331.  The Court has supplemental

jurisdiction of the other related claims pursuant to 28 U.S.C. § 1367 which arise

out of the same transaction or occurrence.  All relevant facts and the gravamen of

the complaint occurred in the Commonwealth of Massachusetts.

6.    Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. §1391(b)

because the facts giving rise to the claims occurred within this district.

Additionally, upon information and belief, the Defendant resides within the

District of Massachusetts.

## FACTS COMMON TO ALL COUNTS

7.    On or about the evening of September 21, 2015, Mr. Corcoran was at his home in

the Back Bay neighborhood of Boston when he heard screaming coming from

outside his residence.

8.    Mr. Corcoran went outside to investigate.  He found that his neighbor was being

attacked by a large man who was hitting him with a bicycle lock.

9.    Simultaneously, several other neighbors began to venture outside.

10.   Mr. Corcoran yelled at the aggressor to stop, and he fled the scene on a bicycle.

11.   Mr. Corcoran, along with other neighbors, began to attend to the victim of the

attack, a neighbor with whom all were acquainted.  Among the neighbors were a

doctor and a medical student.

12.   The victim of the attack suffered severe lacerations to his abdomen and was

bleeding from his head.  The victim was shaken and was unsteady on his feet.

13.     Mr. Corcoran and others attended to the victim of the attack and waited for
emergency responders.

14.     As they waited for an ambulance, Mr. Corcoran held a towel to the back of the
victim's head and assisted the others in gathering information about the victim's
injuries.

15.     Soon thereafter, officers from the Boston Police Department, including the
Defendant Jimmy Giraldo, arrived on the scene.

16.     At all times relevant, the Defendant, Jimmy Giraldo, was acting under color of
state law.

17.     Immediately upon arriving at the scene, Officer Giraldo acted in a combative and
aggressive manner to all present, including the crime victim.

18.     At one point, when the victim tried to move, he screamed out in pain.  Officer
Giraldo began to yell at the neighbors assisting the victim, ordering them not to
touch the victim.

19.     Mr. Corcoran politely told the officer that they were all just trying to help the
victim and that there was no need to be rude.  Mr. Corcoran also told the officer
that there were doctors present on scene.

20.     At that time, Officer Giraldo yelled at Mr. Corcoran and rudely ordered Mr.
Corcoran to leave the area.

21.     Mr. Corcoran immediately got up from the victim's side and began to walk away.

22.     Mr. Corcoran requested the Defendant divulge his name and badge number.

23.     In response, Officer Giraldo produced his badge number.

24.  However, after Mr. Corcoran walked away,  Officer Giraldo stated the he "had enough," walked up to Mr. Corcoran, and grabbed him from behind before shoving him into a parked car and placing him under arrest.

25.  Although he had done nothing illegal, Mr. Corcoran complied with the Defendant's orders and was peacefully handcuffed.

26.  Officer Giraldo then dragged Mr. Corcoran across the street while slamming him into parked cars on the way to the squad car.

27.  All the neighbors present were shocked.

28.  After placing Mr. Corcoran into the squad car, he returned to the group of neighbors and threatened to arrest anyone else that spoke up.

29.  Mr. Corcoran was taken to the Police station, booked into custody, and placed in a holding cell for several hours.

## MONELL CLAIM AND SUPERVISOR LIABILITY FACTS

30.  After Mr. Corcoran was detained, several of the neighbors became upset with Officer Giraldo's unlawful conduct.

31.  As a result, additional officers were called to the scene, including the Patrol Supervisor, Sgt. Buckley, the ranking officer on the scene. All such officers acted under color of law.

32.  Upon arrival, Sgt. Buckley spoke to Officer Giraldo concerning the events leading to Corcoran's arrest.

33.  Upon information and belief, Giraldo's statements to Sgt. Buckley were false.

34. Witnesses to the incident attempted to speak with Sgt. Buckley and give statements concerning Mr. Corcoran's unlawful arrest and Giraldo's false statements.

35. Although there were at least nine (9) witnesses present at the scene who later gave statements which contradict Giraldo's police report, Sgt. Buckley failed to take any of their statements or otherwise intervene.

36. Instead, the witnesses were turned away and no witness statements were taken at the scene.

37. Such failure amounts to deliberate indifference to and/or tacit authorization of Mr. Corcoran's unlawful arrest.

38. Following Mr. Corcoran's arrest, Officer Giraldo filed a police report and application for criminal charges against Mr. Corcoran, alleging Disorderly Conduct, Resisting Arrest, and Interference with a Police Officer.  The report included false statements.

39. Sgt. Buckley's inaction allowed Officer Giraldo to falsify the police report and apply for the false charges.

40. Mr. Corcoran retained private counsel to defend against the false charges.

41. Mr. Corcoran incurred approximately $50,000.00 in legal fees and expenses to defend against the false charges.

42. The charges against Mr. Corcoran were eventually dismissed, resulting in a termination of all of the criminal proceedings in his favor.

43. Following his arrest, Mr. Corcoran filed a complaint with the Boston Police Internal Affairs Department concerning the egregious conduct of Officer Giraldo.

44.   Internal Affairs claims to have taken statements from at least six (6) of the neighbors present at the scene as part of an alleged investigation.

45.   Each of the six (6) witness statements contradicts Giraldo's police report and corroborates Mr. Corcoran's account.

46.   Upon information and belief, the Internal Affairs investigation concluded with no discipline or determination concerning Officer Giraldo's conduct or Sgt. Buckley's failure to intervene.

47.   The Police Department of the City of Boston has a long history of violating the civil rights of its citizens.

48.   At times, after public coverage of egregious events, the City will allege reform.

49.   However, the culture remains one that encourages and condones unconstitutional behavior such as that described above. A few specific matters are discussed below.

50.   Since the 1960s, the Boston Police Department has institutionalized a policy, practice, or custom whereby false arrests, false testimony, and withholding of exculpatory evidence are tolerated and in some cases encouraged.  This is the true policy of the department. Published rules and regulations to the contrary are blatant public relations gimmicks, created for public consumption to cover up the true policy at various times when the department's true policy has been exposed. The history of the true policy is set forth below in detail.

51.   In the 1960s, the United States Supreme Court created the so-called "exclusionary rule."  This provides that if evidence is seized in violation of certain constitutional rights, it must be excluded at trial.

52.   In response to such exclusions of evidence, primarily in drug cases, in circumstances where a police officer's conduct did not conform to proper procedures as defined by the courts, police officers nationwide and in Boston learned to tailor search warrants and testimony to circumvent the possibility that evidence might be excluded because of police misconduct.

53.   The process by which police officers (including Boston Police Officers) falsely tailor testimony to ensure success at trial has become more endemic.  Indeed, a name has been coined to describe such dishonest police conduct.  It is called "testilying."

54.   The Boston Police Department condoned and condones "testilying" to win convictions.

55.   Over the years, members of the Police Department have independently and by a conspiratorial agreement not reported, falsely reported, or inadequately reported many incidents of obvious civil rights violations.  These same police officials have failed to intervene to prevent or stop these incidents, and they have not cooperated or fully cooperated with investigations of such incidents by Internal Affairs.  This type of conspiratorial conduct has been characterized by the Police Department itself as a "code of silence."  When officers who adhere to the "code of silence" are called upon to testify, they routinely engage in the above-described "testilying" behavior.  A specific example of this misconduct is discussed in the case of Commonwealth v. Adams, 416 Mass. 558 (1993).

56.   Throughout the 1980's and 1990's, the Boston Police Department took inadequate steps to discipline or remove from the Police Department officers who had a

history and propensity of engaging in misconduct, which violates the
constitutional rights of citizens, or which demonstrates their unworthiness and
unsuitability for being police officers.  Indeed, one the highest ranking command
staffers (William Celester) was himself indicted and convicted of serious crimes.

57.     During that time, such "testilying" and false arrests were particularly rampant, in
part because they were encouraged by Celester.  Persons known to be innocent,
who spent many years in jail as a result of this culture, include but are not limited
to, Gary Willoughby, Christopher Harding, Tarahn Harris, and Willie Bennet.

58.     During this same period of time, a police officer named Carlos Luna was
convicted of perjury in a case where his partner was killed.  Luna explained
openly that the department taught him to lie and that he was following orders.
Commonwealth v. Luna, 418 Mass. 749, 753 (1994).

59.     Following the false arrest of Willie Bennett described above, Mayor Raymond
Flynn appointed a Management Review Committee to investigate the Police
Department.  On January 14, 1992, the Committee issued its report to the Mayor
(hereinafter the "St. Clair Report").  The St. Clair Report found, among numerous
other problems, that the Police Department had patterns or customs that included:

> i.      tolerance of dangerous patterns of violence against citizens,
> particularly minorities, by its police officers;
>
> ii.     a near total absence of supervisory skills and management training
> for superior officers and command staff members, and dangerously
> inadequate training for newly promoted mid-level supervisors
> (sergeants and lieutenants);

iii.     inadequate supervision, including a dangerously low ratio of
supervisors to patrol officers, particularly in high crime areas;

iv.     failure to discipline offending officers for using excessive force or
covering up the use of excessive force; and

v.      shoddy, halfhearted investigations in response to citizen
complaints of  police misconduct with lengthy delays and
inadequate documentation and recordkeeping of the legal opinion
contained in the St. Clair report as described in the preceding
paragraph.

60.     At or around the same time as the false arrest and imprisonment of Mr. Harding,
Willoughby, and Bennett, Boston Police Officers, in violation of well-established
department rules and regulations and the civil rights of citizens, routinely used
unconstitutional identification procedures and engaged in false arrests, especially
in minority neighborhoods.

61.     The Boston Police Department failed to implement an effective warning system
to identify officers who may have engaged or were likely to engage in
misconduct.  The St. Clair Report specifically recommended that an effective
warning system be adopted.

62.     Although the Boston Police Department instituted an early intervention system in
1992, it was essentially abandoned from 2005 until 2009.

63.     The Boston Police Department's early intervention system remains ineffective and
largely underutilized.

64.     In 1993, the Supreme Judicial Court issued its seminal decision on the Brighton

thirteen; <u>Commonwealth v. Adams,</u> 415 Mass. 558 (1993).  However, the Boston

Police Department ignored the <u>Adams</u> decision and thereby sent the message that

the Adams' conduct would be tolerated.

65.     In <u>Commonwealth v. Adams</u>, 416 Mass. 558 (1993), the Attorney General had

sued the offending officers because the department refused to discipline them.

The Superior Court had entered an injunction.  The Superior Court stated that the

police officers "just don't get it" - that they cannot beat civilians with impunity -

and that the Boston Police "fail to police themselves."  Even then, the City caved

to union pressure and joined with the 13 officers in an unsuccessful appeal to the

Supreme Judicial Court.  The City then settled a consolidated civil case with

Smith for $300,000, but used creative accounting to make it appear as though it

was a payment for "outside counsel."

66.     In 1995, two Boston Police Officers beat a fellow officer, Michael Cox, to within

an inch of his life.  The Cox incident was similar to the <u>Adams</u> incident with one

major distinction; Cox was totally innocent of any crime.  He was mistaken for a

suspect.  As in <u>Adams</u>, the code of silence was immediately implemented; no one

would tell the truth about the incident. The Cox incident and police cover-up has

been memorialized in a book published in 2009 by Dick Lehr, titled: <u>The Fence: a</u>

<u>Police Cover Up Along Boston's Racial Divide</u>.

67.     The Boston Police department made a false show of investigating this incident.

In fact, no real action was taken and Cox was forced to file a civil suit against

those who beat him, the Police Commissioner, and the City. On the eve of Cox's

civil trial, the Boston Police Department made a show of disciplining some involved.

68.     The City ultimately paid Cox and his counsel over 1.2 million dollars to settle and to keep the Commissioner from having to testify in open court.

69.     After Michael Cox was beaten and left for dead, the Boston Police department issued Public Integrity Policy No. 113, which holds supervisors accountable for failure to identify and take steps to discipline those under their command who engage in such behavior.  This is an example of the reactionary nature of the police rules and regulations.  Almost as soon as it was passed, word filtered down to the rank and file that it was not to be taken seriously.

70.     Specific instances of this type of egregious misconduct that resulted from the true policy of "testilying," perjury, and withholding of exculpatory evidence described above can be found in the following cases:

   **A. TARAHN  HARRIS**

        On November 21, 1991, a Suffolk County grand jury returned indictments against Tarahn Harris for murder in the first degree.  In his ruling in favor of Harris' Motion to Dismiss the Indictment, the Honorable Isaac Borenstein, Justice of the Superior Count, found that the City of Boston police officer Herbert Spellman "knowingly and intentionally falsified, recklessly fabricated, distorted, misled and deceived the grand jury."  Officer Spellman distorted Harris' statement, suggesting to the jury that Harris made incriminating statements, while failing to inform the jury that Harris actually made exculpatory statements as well.  He assigned to Harris' statements that Harris had not made and knowledge that Harris may not have had.  Judge Borenstein was "convinced that Officer Spellman knowingly falsified and distorted the evidence against Tarahn Harris

for the purpose of strengthening what appeared to be a weak case against Tarahn Harris."  In response to a complaint of misconduct relating to this incident made by the Boston Police Department, The Boston Police Department on July 15, 1999, in spite of Judge Borenstein's findings, found the allegations against Officer Spellman to be "Not Sustained" and the Police Commissioner accepted the finding.

## B.  CHRISTOPHER HARDING

Christopher Harding was wrongfully arrested and convicted of attempted murder because members of the Boston Police Department committed perjury and withheld exculpatory evidence.  On August 18, 1989, a shooting took place in the Mission Hill Housing Project where Mr. Harding lived.  Boston police officers captured one suspect, but the other fled.  Officer Terrence O'Neil claimed he saw Mr. Harding running away, and that Mr. Harding fired three shots, one of which was fired at him.  Officer Mitchell wrote a report supporting O'Neil's claims, which she knew were false.  Boston police officer Michael Stratton testified at trial that he witnessed Mr. Harding shoot at O'Neil. The officers' version of the events was proven to be false by a ballistics expert before trial.  The expert provided conclusively that the bullet that struck the victim had been fired from the gun belonging to the second suspect, and that only three bullets were fired from that gun.  Thus, it was impossible for O'Neil, Stratton or Mitchell to have witnessed three shots fired from that gun, as they claimed.  The Boston Police Department suppressed this crucial exculpatory evidence of the ballistic expert's findings until just prior to Mr. Harding's trial.  In addition, because she might have recanted her earlier report, the Boston Police Department falsely stated that Officer Mitchell was out of town during the trial and could not testify, thereby suppressing exculpatory evidence.  Mr. Harding was released after spending approximately seven years in jail.  Boston police officers Stratton and Mitchell have never been disciplined in connection with this misconduct, and O'Neil was not fired for his involvement until January 20, 2000.  The city paid Harding and his counsel $475,000.00.

### C.  GARY WILLOUGHBY

City of Boston police officers falsely arrested Gary Willoughby in September, 1989, and charged him with homicide.  He was a poor Jamaican immigrant with no criminal record and no connection to the incident.  After a police officer committed perjury before the grand jury, Mr. Willoughby was acquitted of all wrongdoing in 1990. He subsequently sued the City of Boston and the police officer.  The City paid for the officer's defense and in 1994, it compensated Mr. Willoughby approximately $90,000.00 for the wrongs committed against him.  The police officer involved, Goerge Foley, was farmed out to the ballistics department, but has never been disciplined in connection with the incident.  The City paid Willoughby and his counsel $90,000.00.

### D.  MARVIN MITCHELL

After serving seven years and three months in prison, Marvin Mitchell was vindicated through DNA testing, and his conviction for rape was vacated.  The victim described her assailant to the police as having worn pink pants, while Mr. Mitchell told the police he had been wearing gray pants on the day of the attack.  In addition, the victim told the officers that the assailant had one crossed eye and was clean-shaven.  Mr. Mitchell, on the other hand, did not have a crossed eye and had a goatee at the time of the incident.  Boston police officers Trent Holland and Robin DeMarco both falsely testified under oath that Mr. Mitchell, while being detained, had suddenly exclaimed that he had been wearing pink pants on the day the victim was attacked.  Officers DeMarco and Holland have never been disciplined in connection with this misconduct.

### E.  UNNAMED DEFENDANT

A judge threw out a jury's 1989 guilty verdicts on drug charges secured through the testimony of Boston police officer Trent Holland.  When Superior Court Judge Elizabeth A. Porada, who was later elevated to the Court of Appeals, threw out the verdicts, she ordered an investigation into whether or not Holland committed perjury.

Judge Porada concluded that Holland's testimony about watching a drug transaction from a certain vantage point was necessarily false because his view would have been obstructed by a building.  The perjury investigation was conducted by Boston Police Sergeant James Curran.  Not only was Holland not disciplined in connection with this misconduct, he was later promoted to detective.

## F.  WILLIE BENNETT

On October 23, 1989, Charles and Carol Stuart were shot in the Mission Hill neighborhood of Boston.  William Bennett became a suspect and, through intimidation and coercion, the police produced witnesses to implicate him.  The police threatened the witnesses with arrest, physical beatings and imprisonment if they did not testify against Bennett.  The police offered witnesses money and other inducements in an attempt to coerce them to testify falsely against Bennett.  They supplied witnesses with crucial facts previously known to them for the purpose of enhancing the witnesses' knowledge of incriminating facts against Bennett.  In addition, the police planted evidence in homes of witnesses in order to pressure them into incriminating Bennett.  Bennett was, in fact, innocent of the charges.

## G.  EARL DESSESAURE

On February 1, 1997, Boston Police Detective Michael Feeney testified in the Suffolk Superior Court in the matter of the Commonwealth v Earl Dessesaure before the Honorable Patrick King.  Feeney testified that he had received information from an informant relative to the alleged actions of the defendant, including allegations of drug sales.  Judge King concluded that Feeney's testimony was not credible, and prohibited the Commonwealth from introducing into evidence all alleged cocaine seized from Dessesaure.  The case was later dismissed upon motion of the Commonwealth.  The matter was referred to the Boston Police Department by the District Attorney.  To the best of the plaintiff's knowledge and belief, no disciplinary action was taken by the Police Department,

nor was the allegation of perjury even investigated by the defendant, Boston Police Department.  In 2004, United States District Court Judge Nancy Gertner suppressed evidence seized by Boston Police.  The defendant was again Earl Dessesaure.  Judge Gertner found that the testimony of Boston Police Detective John Broderick was not credible, again in regards to dealings with an alleged informant.  The defendant, Boston Police Department, found the Judge's concern regarding Broderick's truthfulness under oath unfounded.

## H.  KAREEM TYLER

In 2002, Suffolk Superior Court Justice Vieri Volterra granted a motion for a new trial in the matter of the Commonwealth v. Kareem Tyler, a first degree murder case, as a result of finding that Sergeant Detective William Mahoney gave false testimony to the Grand Jury concerning the identification of the defendant by a civilian witness.  Mahoney was never disciplined for his deliberate false testimony, or for concealing exculpatory evidence.

## I.  IDA CONTRADA

On or about October 27, 1999, two Boston Police officers falsely arrested a young woman.  On or about June 6, 2000, a judge of the Boston Municipal Court found there to be no probable cause for the arrest and directed a finding in her favor.  A federal jury awarded her $42,000.00 in 2004.  Neither officer was ever disciplined.  The city paid Contrada and her counsel a total of $80,000.00.

## J.  SCOTT MATALON

On or about September 29, 2010, Boston Police Officers, supervised by Mary Ann O'Neill, entered the home of Scott Matalon without probable cause and under the false pretense that Sgt. O'Neill found an open door at the residence. Thereafter, Matalon was arrested without probable cause and with the use of excessive force. He was ultimately acquitted by a jury of his peers after paying approximately $50,000.00 in attorney's fees to defend against the false charges. A federal jury awarded him $50,000.00 in 2014 and the Honorable Judge Leo T.

Sorokin upheld the verdict as a matter of law. Matalon v. O'Neill, No. CIV.A. 13-10001-LTS, 2015 WL 1137808, at *2 (D. Mass. Mar. 13, 2015), aff'd sub nom. Matalon v. Hynnes, 806 F.3d 627 (1st Cir. 2015).  The City paid for an appeal, but the verdict was affirmed by the First Circuit Court of Appeals. Matalon v. Hynnes, 806 F.3d 627 (1st Cir. 2015).  The city paid Matalon and his counsel approximately $210,000.00.

During the civil trial, Sgt. O'Neill testified falsely to cover up the fact that she violated Mr. Matalon's civil rights.  Subsequent to the verdict, Officers from the Internal Affairs Department interviewed Matalon and his counsel, taking recorded statements concerning events giving rise to the lawsuit and untrue testimony given by Sgt. O'Neill during the trial.  Although the jury's verdict was affirmed by the First Circuit on November 18, 2015, upon information and belief, no discipline or determination has been made concerning Sgt. O'Neill's misconduct or untrue testimony.

71.   The Boston Police Department and City of Boston implicitly tolerated unlawful police practices including suppression of exculpatory evidence and perjury, by failing to investigate properly and punish adequately officers who withheld exculpatory evidence and gave false testimony.  Boston police officers thus believed they could violate, with impunity, the constitutional rights of defendants.

72.   The false arrest of the Plaintiff is the direct and proximate result of the Boston Police Department's condonation and institutionalizing of "testilying."

73.   Because of the actions of the Boston Police Department and Defendants Giraldo, Buckley, and the City of Boston, the Plaintiff sustained severe permanent personal and emotional injuries, including but not limited to, loss of liberty, loss of income, humiliation and emotional distress.

**COUNT ONE**
**VIOLATION OF 42 U.S.C., § 1983**
**AGAINST GIRALDO**

74. Mr. Corcoran repeats and re-alleges each and every allegation above stated as though such allegations were set forth herein.

75. At all times relevant, Officer Giraldo was acting under the color of law.

76. By engaging in the conduct described above, Officer Giraldo deprived Mr. Corcoran of clearly established and well settled constitutional rights while acting under color of law.  Specifically, Officer Giraldo deprived Mr. Corcoran of rights secured and guaranteed to him by the United States Constitution including, but not limited to: his Fourth Amendment right to be free from unlawful seizure of his person and the use of excessive force, his Fifth and Fourteenth Amendment rights to due process of law, including but not limited to, his right to be free from arrest without probable cause, and his right to be free from malicious prosecution.

77. Further, the wrongful acts were undertaken with grossly reckless disregard of Plaintiff's constitutional rights.

78. As a result of the Defendant's violations of Mr. Corcoran's civil rights, he suffered a loss of freedom, loss of enjoyment of life, damage to his reputation, and extreme emotional distress, and was otherwise damaged.

79. The above constitutes violations of 42 U.S.C., § 1983 et seq.

**COUNT TWO:**
**VIOLATION OF 42 U.S.C. § 1983**
**AGAINST CITY OF BOSTON**

80.     Mr. Corcoran repeats and reasserts the allegations contained in the above

        paragraphs and incorporates them by reference as if fully and completely set forth

        herein.

81.     The City of Boston, as an entity, through law enforcement officers at the highest

        level, encouraged, aided and abetted the violations of law described above by

        actively encouraging the officers to indiscriminately arrest anyone they believed

        may be 'disrespectful' to them.  The City of Boston had an obligation to properly

        train its police officers on the elements of criminal charges, and on the right of

        persons to be free from unwarranted intrusions into their homes and the right of

        persons to be free from unlawful arrests.  The City Boston did not properly train

        or supervise its police officers to assure that they complied with the law in

        arresting people without probable cause.  At all pertinent times, The City of

        Boston had a policy or custom of deliberate indifference to misconduct by its

        police officers by failing to properly investigate misconduct and to discipline

        officers.  The City of Boston also had a policy or custom of tolerating a "code of

        silence," in which police officers understood that they were not to report

        misconduct by fellow officers.

82.     Violations of law described above constituted a policy of the City of Boston.

83.     Therefore, the City of Boston as an entity is liable to the Plaintiff per 42 U.S.C. §

        1983.

## COUNT THREE
## VIOLATION OF 42 U.S.C. § 1983
## <u>SUPERVISOR LIABILITY AGAINST SGT. BUCKLEY</u>

84.  Mr. Corcoran repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

85.  At all times relevant, Officer Giraldo was acting under the supervision of Sgt. Buckley.

86.  Sgt. Buckley was aware of Officer Giraldo's misconduct, which posed an unreasonable risk of constitutional violation to Mr. Corcoran.  Further, Sgt. Buckley was deliberately indifferent to the wrongful acts of Officer Giraldo, and his inaction and condonation of Officer Giraldo's offensive practices constitutes tacit authorization.

87.  As a result of Sgt. Buckley's deliberate indifference to Officer Giraldo's conduct, Sgt. Buckley deprived Mr. Corcoran of clearly established and well settled constitutional rights while acting under color of law.  Specifically, Sgt. Buckley deprived Mr. Corcoran of rights secured and guaranteed to him by the United States Constitution including, but not limited to, his Fourth Amendment right to be free from unlawful seizure of his person, his Fifth and Fourteenth Amendment rights to due process of law, including but not limited to his right to be free from arrest without probable cause, and his right to be free from malicious prosecution.

88.  As a result of the Defendants' violations of Mr. Corcoran's civil rights, he suffered a loss of freedom, loss of enjoyment of life and extreme emotional distress, and was otherwise damaged.

89.    Upon information and belief, Sgt. Buckley customarily condoned false arrests, the

filing of false reports, and application for false charges by all of his subordinates.

90.    The above constitutes violations of 42 U.S.C., § 1983 et seq.


**COUNT FOUR**
**VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT**
**AGAINST GIRALDO**

91.    Mr. Corcoran repeats and reasserts the allegations contained in the above

paragraphs and incorporates them by reference as if fully and completely set forth

herein.

92.    By engaging in the conduct described above, including threats, intimidation and

coercion, the Defendant interfered with and deprived Mr. Corcoran of his exercise

and enjoyment of civil rights secured under the laws of the Commonwealth of

Massachusetts, in violation of Massachusetts General Laws Chapter 12 § 11I.

93.    As a direct and proximate result of the Defendant's violations of M.G.L. c. 12 §

11I, Mr. Corcoran suffered damages.


**COUNT FIVE**
**RETALIATION AGAINST CONSTITUTIONALLY**
**PROTECTED SPEECH IN VIOLATION OF 42 U.S.C. §1983**
**AGAINST GIRALDO**

94.    Mr. Corcoran repeats and reasserts the allegations contained in the above

paragraphs and incorporates them by reference as if fully and completely set forth

herein.

95.    By engaging in the conduct described above, the Defendant, Officer Giraldo,

deprived Mr. Corcoran of clearly established and well settled constitutional rights

while acting under color of law.  Specifically, the Defendant deprived Mr.

Corcoran of rights secured and guaranteed to him by the United States

Constitution including, but not limited to, his First Amendment right to free

speech.

96.     The wrongful acts described were intentionally undertaken in retaliation against

Mr. Corcoran's constitutionally protected speech.  Mr. Corcoran engaged in

protected speech when he requested Officer Giraldo's name and badge number.

In response, Mr. Corcoran was adversely affected when Officer Giraldo arrested

him in retaliation, filed a false police report, and falsely and maliciously applied

for criminal charges against him.

97.     As a result of the Defendant's violations of Mr. Corcoran's civil rights under 42

U.S.C. § 1983, he suffered economic loss, loss of enjoyment of life, emotional

distress, and was otherwise damaged.

98.     The above constitutes violations of 42 U.S.C. § 1983 et seq.


**COUNT SIX**
**FALSE IMPRISONMENT**
**AGAINST GIRALDO**

99.     Mr. Corcoran repeats and reasserts the allegations contained in the above

paragraphs and incorporates them by reference as if fully and completely set forth

herein.

100.    On or about September 21, 2015, Mr. Corcoran was unlawfully and intentionally

confined against his will without right or privilege.  This was the direct result of

the unlawful conduct of the Defendant.

101.    As a direct and proximate result of the acts described above, the Plaintiff was

falsely imprisoned, deprived of his liberty, and therefore was damaged.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court:

a.    Order judgment in Plaintiff's favor in such amount as will fully compensate him

for his losses to the greatest extent allowed by law;

b.    Order such payment of punitive damages as are allowed by law;

c.    Use its fullest equitable powers to enjoin the Defendant from using excessive

force, filing false reports, making false arrests, and using the legal system to

retaliate against citizens;

d.    Use its fullest equitable powers to order Defendant City of Boston to institute

appropriate police training, supervision and disciplinary response that will require

and promote truthful police behavior;

e.    Use its fullest equitable powers to order Defendant Giraldo to submit to

appropriate police training that will promote peaceful and truthful police

behavior;

f.    Order payment of interest, costs and attorneys fees pursuant to 42 U.S.C. §§ 1983

and 1988 and M.G.L c. 12 § 11H and I, and any other statute or common law

theory applicable to these facts; and

g.    Order such further relief as this Court deems fair and just.

## JURY DEMAND

**PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY ON ALL**

**ISSUES SO TRIABLE.**

RESPECTFULLY SUBMITTED,
PLAINTIFF

John R. Corcoran

 /s/ *Robert S. Sinsheimer*
Robert S. Sinsheimer, BBO No. 464940
Wesley B. Stoker, BBO No. 692159
Sinsheimer and Associates
92 State Street, 9th Floor
Boston, MA 02109
617-722-9954

Dated: December 2, 2016